**LUBIN & ENOCH, P.C.**
Nicholas J. Enoch, State Bar No. 016473
Morgan L. Bigelow, State Bar No. 037516
Taylor M. Secemski, State Bar No. 035678
349 North Fourth Avenue
Phoenix, Arizona 85003-1505
Telephone: (602) 234-0008
Facsimile: (602) 626-3586
Email: nick@lubinandenoch.com
morgan@lubinandenoch.com
taylor@lubinandenoch.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| Alyssa E. Nessel, | No. CV-23-00095-PHX-DMF |
|---|---|
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANT JDM GOLF, LLC'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| JDM Golf LLC, | **ORAL ARGUMENT REQUESTED** |
| Defendant. | (Assigned to the Honorable Deborah M. Fine) |

Plaintiff Alyssa Nessel ("Nessel"), by and through undersigned counsel, hereby submits her Response to Defendant JDM Golf, LLC's ("JDM Golf") Motion for Summary Judgment ("MSJ"). Nessel respectfully requests the Court deny JDM Golf's MSJ in its entirety because Nessel has presented a plethora of evidence to support that there are genuine issues of material fact.

This Response is supported by the record before this Court, Nessel's Controverting Statement of Facts ("CSOF") and Supplemental Statement of Facts ("PSOF") along with the corresponding exhibits, filed simultaneously herewith. [Dkt. 56]

## I. FACTUAL BACKGROUND

Nessel started working as a beverage cart server for JDM Golf, LLC at the Wigwam on May 13, 2019. [Dkt. 54, Separate Statement of Facts in Support of Defendant JDM Golf, LLC's Motion for Summary Judgment ("DSOF") ¶ 1] While she started in a part-time capacity, she eventually transitioned to full-time status. [PSOF ¶ 86] Leo Simonetta ("Simonetta"), JDM Golf's Director of Operations, was Nessel's direct supervisor. [DSOF ¶ 3] Simonetta believed that Nessel was off to a good start in her role and thought that she provided exceptional food and beverage service to golfing guests. [PSOF ¶ 87]

On September 13, 2019, Nessel was working at Wigwam's "Gold Course" for a tournament. [DSOF ¶ 43]. While she was filling up cups of ice for customers with her back turned, a golfer "pulled on [her] skirt, okay, grabbed [her] ass, pulled on the skirt to try to pull it off. And I was just flabbergasted." [PSOF ¶¶ 93-94] Further, Nessel stated that when the golfer "smacked, grabbed, pulled" her skirt it exposed "one side of [her] buttocks." [PSOF ¶94] She told the man, "Don't touch me." [PSOF ¶ 95] While Nessel was upset and

1

embarrassed after the incident, she completed the order. [CSOF ¶ 96] Another golfer in the tournament saw that Nessel was upset and flagged down two JDM Golf employees. [CSOF ¶ 46]

When Simonetta met Nessel in his office, she was very emotional and visibly upset. [DSOF ¶ 97] Nessel gave a description of the perpetrator, including that he was a gray-haired man, older in about 60's, tall about 6'2, wearing a blue shirt with a pinstripe, hat, and lighter shorts. [PSOF ¶ 98] Simonetta contacted Resort Security. [CSOF ¶ 49] Randy Hernandez, Wigwam Director of Security, contacted law enforcement. [DSOF ¶ 52] The Maricopa County Sheriff's Office arrived to locate the perpetrator. [DSOF ¶ 52] Sheriff's Officers asked Nessel if she would go out on the golf course to try and identify the perpetrator. [CSOF ¶ 55] However, Nessel declined because she did not feel comfortable being exposed riding around on the cart after the incident. [PSOF ¶ 99] Nessel was cooperative in providing a detailed description of the perpetrator and reviewing the list of golf pairings in the tournament. [CSOF ¶ 55]

Next, Nessel went with Simonetta to help locate the perpetrator in the onsite restaurant at Wigwam, Red's. [CSOF ¶ 57; PSOF ¶ 100] She was able to point out the perpetrator to Simonetta. [CSOF ¶ 57] However, at the time of the identification, the Sheriff's Deputies were not present in Red's because they were standing in the golf shop. [CSOF ¶ 58; PSOF ¶ 101] Nessel believed Simonetta would notify the police that she identified the perpetrator, but her identification of the perpetrator never showed up in the police report, and she never saw Simonetta talk with the police after the identification. [CSOF ¶ 58; PSOF ¶¶ 101-102] Moreover, the golf pairing listings that Nessel wrote on

was not provided to the police. [PSOF ¶ 103] Nessel finished up her closing paperwork for the shift and went home. [CSOF ¶ 61]

The September 13, 2019 incident against Nessel was offensive, abusive, unwelcome conduct, and violated JDM Golf's Zero Tolerance Policy Against Unlawful Harassment. [PSOF ¶ ¶ 104-105] As a result of the incident, Nessel began experiencing panic attacks. [PSOF ¶ 112] Prior to this incident, Nessel had experienced an incident where another golfer, who was a guest of a coworker, got in her golf cart, invaded her space, may have kissed her cheek, and made her feel uncomfortable. [PSOF ¶ 91] While Nessel may have notified Cicci of this incident, she did not report this incident to Simonetta because she did not want to have an issue with her coworker. [PSOF ¶ 92] After September 13, 2019, JDM Golf made no further attempts to locate the perpetrator or provide any resources or tools to Nessel. [PSOF ¶ 107] Additionally, JDM Golf did not ask HR Consultant, Tracey Bannon ("Bannon") to investigate or speak to Nessel about the September 13, 2019 incident. [PSOF ¶ 106] Moreover, Simonetta did not document the incident or his involvement in the aftermath of September 13, 2019. [PSOF ¶ 107]

Upon her return to work a few days after the incident, Nessel met with Simonetta and Rick Cicci ("Cicci") on September 17, 2019. [CSOF ¶ 62] During this meeting, Nessel notified JDM Golf that her coworkers were harassing her regarding the September 13, 2019 incident call her "crazy" and saying that it never actually happened. [PSOF ¶ 108] Rather than address the harassment allegations, Simonetta referred to the statements as "gossip" and brought up that she needed to focus on her performance instead, and that the tardiness gave ammunition to the gossip. [PSOF ¶ 109] Nessel's coworker, Olivia Vanderlie,

3

confirmed to Simonetta that she heard the statement being made. [PSOF ¶ 110] No further conversation or actions took place between JDM Golf and Nessel regarding the September 13, 2019 incident. [PSOF ¶ 111]

Shortly after the September 13, 2109 incident, Nessel was formally written up for her attendance issues for the first time on September 28, 2019. [PSOF ¶ 88] While Nessel admitted that she was late a number of times for work, she never no-called/no-showed for a shift. [PSOF ¶¶ 89-90] Pursuant to the instructions she was provided, Nessel would call the pro shop to let them know if she could not make it in for a shift. [PSOF ¶ 90] JDM Golf alleges that Nessel was consistently counseled and disciplined throughout her employment about her attendance. [CSOF ¶15] However, Simonetta could not remember the dates or the number of times he counseled Nessel on her attendance, nor did he document these occasions, or formally write her up until September 28, 2019. [PSOF ¶¶ 15, 88]

On September 20th-21st, 2019, Nikko Grau ("Grau"), an employee at JDM Golf in a managerial position began sexually harassing Nessel via text message. [CSOF ¶ 69-70; PSOF ¶¶ 113, 117] These text messages made Nessel uncomfortable, and she attempted to politely rebuke and deflect the sexual advances made by Grau. [PSOF ¶¶ 114-115] After completing a sexual harassment training, it became evident to Nessel that the text messages from Grau were not acceptable. [CSOF ¶ 73] Nessel reported and provided the text messages to Cicci, who then notified Simonetta via email along with sending the text messages. [CSOF ¶¶ 73, 79] Again, HR Consultant Bannon did not conduct an investigation. Rather, she assisted Simonetta in a consultative manner. [CSOF ¶ 76; PSOF ¶116] This included Bannon attempting to reach Nessel on weekends when she was tied

4

up at a wedding or handling personal chores. [CSOF ¶ 77] The scope of the alleged investigation included Simonetta and Bannon meeting with Grau, him admitting that his behavior was not appropriate, and Bannon asking him what he felt the consequences of his behavior should be. [PSOF ¶¶118-119] Ultimately, after being asked what he felt the consequences of his behavior should be, Grau was suspended for one week without pay. [PSOF ¶¶ 119, 121]

Nessel's second formal written discipline for attendance issues came on October 15, 2019, just a few days after she notified Cicci of the sexually harassing text messages from Grau. [DSOF ¶ 24] This was her last attendance issue, and Nessel was written up on that date. [DSOF ¶ 24; PSOF ¶ 123] Yet three days later on October 18, 2019, Nessel was written up for attendance issues one final time and terminated that day [PSOF ¶ 124] Nessel's termination occurred about one month after the September 13, 2019 incident and about one week after reporting the Grau sexually harassing text messages on October 12, 2019. [PSOF ¶ 126] Nessel was terminated in retaliation for reporting these incidents. [PSOF ¶ 127]

Other employees at JDM Golf had similar attendance issues, but they were not terminated as a result. [PSOF ¶ 125] Moreover, Nessel was not afforded the opportunity to address what she though the proper discipline would be based on her tardiness like Grau had been. [PSOF ¶¶ 119-120] JDM Golf failed to properly investigate and remediate after the September 13, 2019 incident, including the subsequent harassment and bullying Nessel reported by coworkers. [PSOF ¶¶ 106-107] Further, JDM Golf attempted to blame Nessel's coworker's harassment and bullying on her tardiness rather than make any attempt to

5

address the problem. [PSOF ¶¶ 108-109]

## II. LEGAL STANDARD

Summary judgment is only appropriate if the evidence, viewed in light most favorable to Nessel, shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgement as matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute exists when, considering the evidence in the record, a rational factfinder could find in favor of the non-moving party. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). The disputed facts must be material to the outcome of the suit and the evidence such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, "the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. University of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000). This is due to the fact that "the ultimate question is one that can only be resolved through a searching inquiry - one that is most appropriately conducted by the factfinder, upon a full record. Were we to increase the amount of proof required to survive summary judgment when conditions of employment are involved, the result would be to remove from factfinders the ability to consider claims that merit full exploration." *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1111 (9th Cir. 1991), *superseded on other grounds as explained in Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1041 (9th Cir. 2005). Here, Nessel has met this standard to overcome JDM Golf's MSJ.

## III. A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER (1) PLAINTIFF WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT AND (2) JDM GOLF RETALIATED AGAINST PLAINTIFF.

Nessel respectfully requests that this Court deny JDM Golf's MSJ because genuine disputes of material fact exist regarding Nessel's claims for sexual discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), § 42 U.S.C. 2000e, *et seq.*, and the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1461, *et seq*. Nessel's discrimination and retaliation claims under the ACRA are "generally identical" to Title VII, and "Title VII case law [is] persuasive in the interpretation of [the Arizona] Civil Rights Act." *See Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004)(quoting *Higdon v. Evergreen Int'l Airlines, Inc.*, 138 Ariz. 163, 673 P.2d 907, 909-10, n.3 (Ariz. 1983).

Nessel has established that JDM Golf is liable for discrimination based on sexual harassment for the (1) sexual assault by a golf customer on September 13, 2019, and (2) the sexual harassing text messages from another JDM Golf employee in a managerial position. JDM Golf's alleged reason for Nessel's termination, chronic tardiness, is pretext for the retaliation that occurred after reporting the two incidents of sexual harassment and the corresponding aftermath.

### A. Plaintiff Can Establish Discrimination Under Title VII and the ACRA.

Nessel's sexual discrimination claims under Title VII and the ACRA stem from two incidents. First, JDM Golf failed to adequately investigate and protect Nessel after she was sexually assaulted by a golfer at a Wigwam golf tournament on September 13, 2019. [PSOF ¶¶ 106-107] Subsequent harassment and bullying ensued by Nessel's coworkers regarding the September 13, 2019 incident. [PSOF ¶ 108] Rather than investigate or address the

allegations, Simonetta referred to the allegations as gossip and blamed it on her attendance. [PSOF ¶ 109] Second, Nessel was subjected to sexual harassment through text messages by a manager at JDM Golf. [CSOF ¶ 69-70; PSOF ¶¶ 113, 117] JDM Golf attempts to greatly minimize these incidents by referring to them as simply "a tug on her skort and touch on her clothed bottom" and some "off-color" text messages. However, this mischaracterizes the severity of the conduct that took place. Both incidents constitute an unlawful hostile work environment for which JDM Golf is liable. Thus, this Court should deny Defendant's MSJ to dismiss Nessel's claims for sexual discrimination.

### 1. Plaintiff Was Subject to a Hostile Work Environment.

To establish a prima facie case of a hostile work environment, Nessel must show "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007). A female employee states a hostile work environment prima facie case when "she alleges conduct which a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991).

#### a. The September 13, 2019 Incident and Subsequent Harassment Created a Hostile Work Environment for Which JDM is Liable.

JDM Golf attempts to greatly distort the severity of the sexual abuse that occurred to Nessel while at work on September 13, 2019. While Nessel was filling up cups of ice

8

for golfers at a Wigwam golf tournament with her back turned, a golfer "pulled on [her] skirt, okay, grabbed [her] ass, pulled on the skirt to try to pull it off. And I was just flabbergasted." [PSOF ¶¶ 93-94] Further, Nessel stated that when the golfer "smacked, grabbed, pulled" her skirt it exposed "one side of [her] buttocks." [PSOF ¶ 94] Nessel was visibly upset and shaken, so much so, that another golfer in the tournament went out her way to assist Nessel in the aftermath of the incident. [CSOF ¶ 46] After this incident, Nessel began experiencing panic attacks. [PSOF ¶ 112] Moreover, this was not the first incident while working for JDM Golf that a golfer made her uncomfortable. Prior to this incident, a golfer got in her golf car, invaded her space, may have kissed her cheek, and made her feel uncomfortable. [PSOF ¶ 91]

JDM Golf claims that this single incident was not severe or pervasive enough to rise to the level of a hostile work environment. To support this analysis, JDM Golf relies on several cases where the sexually harassing behavior was committed by another employee. However, Nessel's claim is distinct because the sexual harassment was committed by a non-employee golfer. There is clear precedent supporting that a single physical incident by a non-employee can be severe enough to meet the hostile work environment threshold. In *Little v. Windermere Relocation, Inc.*, the court found that a single incident of severe abuse can constitute a hostile work environment. *See* 301 F.3d 958, 966 (9th Cir. 2002) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 121 (S. Ct. (2001)).

When analyzing a hostile work environment, the "frequency of the discriminatory conduct is only one fact in the analysis." *Id.* at 967. In determining whether an environment is sufficiently hostile to violate Title VII, courts look at all of the circumstances including

9

frequency, severity, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance. *See Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Moreover, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct" *Ellison*, 924 F.2d at 878.

The September 13, 2019 incident where a male golfer "pulled on [her] skirt… grabbed [her] ass, pulled on the skirt to try to pull it off." which exposed "one side of [her] buttocks," was severe. [PSOF ¶¶ 93-94] Additionally, the conduct was both physically threatening and humiliating. Nessel was visibly upset, shaken, and embarrassed by what happened. [CSOF ¶ 96] She began experiencing panic attacks after the incident. [PSOF ¶ 112] The nature of her position as a beverage cart server put her in constant contact with golfers, which could have included the man who assaulted her. The conduct by the perpetrator was sufficient to interfere with Nessel's work.

Here, this Court need not analyze the egregious September 13, 2019 incident on its own as a single incident. A complete analysis of the hostile work environment that Nessel worked in includes more than just the incident with the golfer. In the aftermath of the incident, Nessel experienced harassment and bullying from her coworkers as a result of the sexual assault. [PSOF ¶ 108] Specifically, Nessel reported that coworkers were calling her "crazy" and stating that the incident never actually happened. [PSOF ¶ 108] Following reporting protocol, Nessel brought this issue up to Simonetta and Cicci during the September 17, 2019 meeting. [PSOF ¶ 108] Rather than address the statements as what they were, harassment and bullying, JDM Golf referred to these statements as "gossip."

[PSOF ¶ 109] Even though another JDM Golf employee confirmed that these statements were being made, Simonetta told Nessel that her tardiness was giving coworkers the ammunition to "gossip" about the September 13, 2019 incident. [PSOF ¶ 109] It is unclear how Nessel could feel safe at work to do her job when JDM Golf refused to take her reports of harassment seriously. Finally, the analysis of whether the work environment was severe or pervasive enough as a whole to rise with a hostile work environment warrants additional attention to the sexually harassing text messages from a JDM Golf manager which will be addressed further in the section below.

Turning to JDM Golf's liability, an employer is liable for the sexual harassment perpetrated by a non-employee if the employer "knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. 1604.11. It is clear that the analysis turns on more than just the underlying harassing conduct by a non-employee. Central to the liability analysis is the employer's reaction to the harassment, subsequent investigation, and assessment of what remedial steps are taken.

JDM Golf correctly states that, "[T]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *See Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1018 (9th Cir. 2018)(quoting *Swenson v. Potter*, 271 F.3d 1184, 1196-1197 (9th Cir. 2001)). JDM alleges that they properly investigated the September 13, 2019 incident. However, the totality of the investigation included contacting the police and spending a few hours attempting to locate the perpetrator. No further investigation occurred. Moreover, Nessel was not excused from completing her closing paperwork.

[CSOF ¶ 61]  Further, when Nessel she was being mocked and harassed by coworkers in the aftermath of the September 13, 2019 incident, JDM Golf's alleged prompt investigation entailed discrediting the allegations as "gossip" and blaming the "gossip" on her attendance. [PSOF ¶¶ 108-111]

In *Folkerson v. Circus Circus Enterprises, Inc.*, when an employer learned that customers were inappropriately attempting to touch an employee, the employer assigned a coworker to follow and protect the employee, provided a sign directing customers not to touch the employee, and enlisted the help of coworkers to tell customers not to touch the employee as well as immediately contact security if any incidents occurred. 107 F.3d 754, 756 (9th Cir. 1997). Here, JDM Golf made no effort to provide any resources or tools to Nessel such as a sexual assault hotline information, an employee assistance program, or the phone number for JDM Golf Human Resources. [PSOF ¶¶ 106-107] JDM Golf took no steps to protect the safety of Nessel, and is therefore liable for the aftermath of the September 13, 2019 incident.

### b. Grau's Sexual Harassing Text Messages Created a Hostile Work Environment for Which JDM Golf is Liable.

In addition to the September 13, 2019 incident by a golfer and the subsequent harassment by coworkers, Nessel was sexually harassed through text messages from a manager at JDM Golf. To minimize the severity of the sexually harassing text messages sent by Grau, JDM Golf attempts to classify him as a coworker and mischaracterizes Nessel's part in the communication as banter that she encouraged and participated in. However, Grau was in a managerial position at JDM Golf, and Nessel attempted to politely

rebuke and deflect the sexual advances made by Grau. [PSOF ¶¶ 113-115]

First, JDM Golf alleges that the text messages did not create a hostile work environment. However, both Simonetta and Bannon agreed that Grau's text messages were conduct of a sexual nature. [PSOF ¶¶ 117] These text messages from Grau included numerous references to sex, getting laid, and sleeping with him. JDM Golf relies on a case that found "a single string of sexually-charged messages, divorced from any physical contact—is simply not enough," to support their argument that Nessel was not subject to a hostile work environment. *Chesier v. On Q Fin. Inc.*, 382 F. Supp. 3d 918, 920-921 (D. Ariz. 2019). Curiously, this analysis excludes the September 13, 2019 incident and the subsequent harassment and bullying from coworkers. A hostile work environment is not assessed in a piecemeal manner. Rather, the trier of fact must determine whether sexual harassment exists in light of the record as a whole and the totality of the circumstances." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69 (1986).

Under Title VII, an employer's liability for harassment is dependent on the status of the harasser. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the harasser is a supervisor, an employer is strictly liable if the supervisor's harassment culminates in a tangible employment action. *See id.* When Nessel reported the text messages to JDM Golf, the alleged prompt investigation and remedial action was Grau being afforded the opportunity to provide feedback on what he thought the proper punishment was for his actions, which ultimately led to a one-week suspension. [PSOF ¶¶ 1118-119, 121] Conversely, (1) Nessel was blamed for encouraging Grau's behavior, (2) perceived to not cooperated in the investigation, and (3) alleged to have intentionally delayed reporting,

which is simply not true. [CSOF ¶ 73; PSOF ¶¶ 114-115] All of this culminated in the tangible employment action, her termination, within one week of reporting the text messages to JDM Golf. [PSOF ¶ 126] Thus, JDM Golf is strictly liable for the sexual harassment that occurred.

Assuming, *arguendo*, Grau was not a manager, JDM Golf will be liable for the sexual harassment by Grau if they were negligent in controlling the working conditions. *See id*. at 421. As addressed throughout this Response, JDM Golf was negligent in its investigation, response, and remedial action to both the September 13, 2019 incident and Grau's text messages.

### 2. Plaintiff Can Establish Mixed Motive Discrimination.

Even if the Court finds that Nessel did have attendance issues, the facts are that JDM Golf waited until after the sexual assault and harassment to address and document this issue. Under 42 U.S.C. § 2000e-2(m), "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice." (emphasis added) Here, Nessel has shown that reporting the sexual assault, subsequent harassment and bullying by coworkers, and sexually harassing text messages by a manager was a motivating factor in her termination.

### B. Plaintiff Can Establish Retaliation Under Title VII and the ACRA.

To establish a prima facie case for retaliation, Nessel must show that (1) she engaged in protected activity, (2) she was subjected to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *See Hernandez v.*

14

*Spacelabs Med., Inc.*, 343 F.3d 1107, 1113 (9th Cir. 2003); *See also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)(holding that for the third element plaintiff must show "her protected activity was a but-for cause of the alleged adverse action by the employer."). Once Nessel establishes a prima facie case for retaliation, the burden shifts to JDM Golf "to articulate a legitimate nondiscriminatory reason for the adverse employment action at issue." *Hernandez* 343 F.3d at 1112. If JDM Golf can articulate a legitimate non-discriminatory reason for her termination, Nessel must demonstrate that the proffered reason is pretextual. Pretext can be proven indirectly by (1) showing the proffered explanation for termination is unworthy of credence because it is internally inconsistent or otherwise unbelievable, or (2) directly by showing that the unlawful discriminatory reason more likely motivated the employer. *See id.*

In it MSJ, JDM Golf does not dispute that Nessel engaged in protected activity by reporting the September 13, 2019 incident, the corresponding harassment by coworkers, and the sexually harassing text messages from a JDM Golf manager. Additionally, JDM Golf does not dispute that Nessel was subject to an adverse employment action when she was terminated. Moreover, the MSJ does not address or deny a causal link exists between Nessel engaging in the protected activity and JDM Golf terminating her employment.

The crux of JDM Golf's argument is that Nessel cannot prove but for her protected activity, she would not have been terminated. *See* NINTH CIRCUIT MODEL CIVIL JURY INSTRUCTIONS, § 10.8 (2017)(revised in Mar. 2022). Specifically, JDM Golf relies on Nessel's alleged continued attendance issues as the basis for her termination. Causation under this analysis can be inferred based on the proximity in time between engaging in the

protected activity and the retaliatory act. In *Clark County Sch. Dist. v. Breeden*, the Supreme Court recognized that "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" 532 U.S. at 273. Close proximity sufficient to establish a prima facie case of retaliation exists in a number of different circumstances. *See Miller v. Fairchild Industries, Inc.,* 885 F.2d 498, 505 (9th Cir 1989)(finding causation inferred when adverse actions happened forty-two and fifty-nine days after protected activity); *Alves v. Emerald Corr. Mgmt. LLC*, 2012 U.S. Dist. LEXIS 105774 at *15-16 (D. Ariz. July 27, 2012) (citing *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000)(finding found two weeks between the reported harassment and termination sufficed to establish a prima facie case of causation.).

Nessel's termination occurred about one month after the September 13, 2019 incident and about one week after reporting the Grau sexually harassing text messages on October 12, 2019. [PSOF ¶ 126] Here, the temporal proximity falls well within the very close time frame sufficient to establish a prima facie case of retaliation. JDM Golf relies on a number of cases for the proposition temporal proximity alone is not sufficient if the employer has evidence supporting attendance or performance issues. However, JDM Golf did not take Nessel's attendance issues seriously or ask her to sign a formal written reprimand until *after* the September 13, 2019 incident. [PSOF ¶ 88] The final tardy that allegedly led to Nessel's termination was documented in her second written reprimand on October 15, 2019. JDM Golf then waited until two days later to use that same October 15,

2019 tardy as an excuse to terminate her. [DSOF ¶ 24; PSOF ¶¶ 123-124]

Finally, Nessel does not exclusively rely on temporal proximity to support her argument. Another method to support pretext is to show that other similarly situated employees who did not engage in protected activity, but had similar attendance problems, were treated more favorably. *See Chuang v. University of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000), Nessel was not the only JDM Golf employee to have attendance issues. Many different JDM Golf employees had similar attendance issues, but they were not terminated as a result of their lack of timeliness. [PSOF ¶ 125] In fact, Nessel's attendance issues did not become an issue worth documenting or formally addressing until after she engaged in the protected activity. Moreover, coworkers who engaged in harassing and bullying behavior towards Nessel were not disciplined for their behavior. [PSOF ¶ 109] Because JDM unlawfully retaliated against Nessel, this Court should deny JDM Golf's MSJ.

## IV. CONCLUSION

Nessel respectfully requests that this Court deny JDM Golf's MSJ because genuine issues of triable fact exist.

RESPECTFULLY SUBMITTED this 17th day of May 2024.

LUBIN & ENOCH, P.C.

/s/ Nicholas J. Enoch
Nicholas J. Enoch
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of May 2024, I electronically transmitted the foregoing document to the U.S. District Court for the District of Arizona Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Jay A. Zweig
Melissa R. Costello
Ballard Spahr, LLP
1 E. Washington Street
Suite 2300
Phoenix, AZ 85004
zweigj@ballardspahr.com
costellomr@ballardspahr.com
*Attorney for Defendant JDM Golf, LLC*

/s/ Sheri L. Estrada